UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LILLIBRIDGE HEALTH CARE
SERVICES, INC.,

                    Plaintiff,

-vs-                                      Case No.  6:08-cv-1028-Orl-28KRS

HUNTON BRADY ARCHITECTS, P.A.,
and HEERY INTERNATIONAL, INC.,

                    Defendants.
_____

## MEMORANDUM DECISION AND ORDER

This action brought by Lillibridge Healthcare Services, Inc. ("Lillibridge") against

Hunton Brady Architects, P.A. ("Hunton Brady") and Heery International, Inc. ("Heery") was

tried to the Court sitting without a jury from May 24-27, 2010.  Upon consideration of the

evidence and testimony presented, argument of counsel, and the proposed findings and

conclusions submitted by the parties, the Court issues the following opinion as its findings

of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

### I.  Factual Overview and Procedural History

Lillibridge is in the business of developing and managing healthcare real estate, and

it specializes in ambulatory care, outpatient services, and medical office buildings.  Hunton

Brady is an architectural firm, and Heery is an engineering firm.

In October 2003, Lillibridge's predecessor, Mediplex Medical Building Corporation

("MMBC"), entered into an "Agreement for Architectural/Engineering Services" ("the

Contract") with Hunton Brady pursuant to which Hunton Brady was to provide services in connection with the design of a four-story medical office building ("MOB") approximately 93,000 square feet in size.  (Joint Pretrial Statement ("JPS"), Doc. 62, ¶ 9(a), (d); Contract, Joint Ex. 1).  The Contract was later assigned to Lillibridge, which had purchased the assets of MMBC.  (JPS ¶ 9(b)-(c)).  The design drawings for the MOB were completed by a separate architectural firm, Robert M. Stern ("Stern"), and had been previously approved by Lillibridge.  (Id. ¶ 9(e)).  Hunton Brady's role under the Contract was to complete design development and construction documents for the MOB shell, exclusive of any tenant finish-out, based on Stern's design drawings.  (Id. ¶ 9(f)).  As stated in the Contract and as stipulated by the parties, the MOB shell was to be designed to house an ambulatory surgery center on the fourth floor.[1]  (Contract at "Page 1 of 11"; JPS ¶ 9(g)).

The Contract stated that Hunton Brady would retain an Engineering Consultant agreeable to Lillibridge to provide the engineering services for the MOB shell, and it is undisputed that Lillibridge directed Hunton Brady to retain Heery—then known as HLM Design—for that purpose.  (Contract at "Page 9 of 11"; JPS ¶ 9(i)).  Accordingly, on November 7, 2003, Hunton Brady entered into a "Standard Form of Agreement Between Architect and Consultant" ("the Subcontract") with Heery[2] pursuant to which Heery was to provide mechanical, electrical, plumbing, fire protection, and structural engineering services

---

[1]The Contract also stated that the MOB was to house a cancer center on the first floor; however, the plan for the cancer center was abandoned.

[2]HLM Design is the named engineering firm in the Subcontract.  Heery is HLM Design's successor in interest, and it later assumed HLM Design's obligations under the Subcontract.

for the project.  (Subcontract, Joint Ex. 2; JPS ¶ 9(j)).  The Subcontract incorporates the terms of the Contract, both by general and specific reference.  (Subcontract at 2; JPS ¶ 9(k)). The Subcontract required Heery to "provide [Hunton Brady] with [the professional services enumerated therein] in the same manner and to the same extent as [Hunton Brady] is bound by the [Contract] to provide such services for [Lillibridge]."  (Subcontract at 2).

Pursuant to the Contract and Subcontract, Hunton Brady and Heery provided architectural and engineering drawings, respectively, for the MOB shell.  The plans were completed in August 2004 and were submitted to and approved by the Osceola County Building Department.  Construction began in December 2004, and the MOB shell was substantially completed by 2006.  During construction and tenant fit-out of the MOB, three problems arose that resulted in increased costs being incurred by Lillibridge.  Lillibridge blames Defendants for each of these issues—referred to by the parties and herein as "the HVAC error," "the GFI error," and "the porte cochère lighting error."

Lillibridge filed this lawsuit in June 2008 to recover the costs it incurred in remedying these three problems.  Prior to trial, Lillibridge estimated its damages from these three issues at roughly $300,000, with more than eighty percent of this amount attributed to the HVAC error.  (JPS at 13).

In its Complaint (Doc. 1), Lillibridge alleged five counts:  breach of contract against Hunton Brady (Count I); negligent design against Hunton Brady (Count II); breach of contract against Heery (Count III); negligent design against Heery (Count IV); and negligent

misrepresentation against Heery (Count V[3]).   Hunton Brady asserted crossclaims for indemnity and contribution against Heery.  (Am. Cross-cl., Doc. 15).  Both Defendants filed motions for summary judgment, but the Court denied both motions.  (Order, Doc. 67).  The case proceeded to a bench trial, during which Lillibridge voluntarily dismissed its negligence claim against Hunton Brady (Count II) and Hunton Brady dismissed its contribution crossclaim.  It is undisputed that Lillibridge blames Heery for the engineering issues and does not allege that Hunton Brady was negligent in its architectural designs; Lillibridge sued Hunton Brady because the main Contract was made with Hunton Brady and not directly with Heery.

## II.  Trial Evidence and Findings

Prior to trial, the parties stipulated to certain facts and to the applicability of certain codes.  (See JPS).  The Court adopts those stipulations as part of its factual findings and legal conclusions.  The parties also stipulated to the admission of seventy-two joint exhibits, (see Ex. List, Doc. 85), and two additional exhibits were received from Plaintiff, (see Ex. List, Doc. 84).  During the four-day trial, the Court heard testimony from five lay witnesses—Philip Taylor, senior vice-president for architecture and construction for Lillibridge; Charles W. "Chuck" Cole, Jr., Hunton Brady's principal in charge of healthcare architecture at the time of the events at issue[4]; Mark Stringer, managing principal of non-party Meinhardt

---

[3]This count is mislabeled as a second "Count IV" in the Complaint.  (See Doc. 1 at 12).

[4]At the time of trial, Cole was the president of Hunton Brady.

Engineering; Richard "Dick" Snyder, a lighting designer who served as project manager for Heery; and Salvatore "Sam" Siciliano, one of two Heery mechanical engineers who worked on the project. Additionally, three other engineers—James Welter, Joseph DiGuglielmo, and Kenneth Rigby—testified as expert witnesses. Based on the exhibits and testimony, the Court makes the following findings and conclusions regarding the three alleged errors for which Lillibridge seeks to recover damages. The issues are discussed here on an error-by-error basis as presented by the parties; later in this Order the counts of the Complaint will be addressed separately.

A.  The HVAC Error

1.  The Problem

The main—and most costly—error alleged by Lillibridge is the HVAC error, a problem that came to light during tenant build-out of the ambulatory surgery center ("ASC") space on the fourth floor of the MOB. As earlier noted, the Contract and Subcontract required Hunton Brady and Heery to provide "design development and construction documents for the MOB shell, exclusive of tenant finish-out." (Contract at "Page 1 of 11"). Hunton Brady and Heery were the architects and engineers, respectively, for the MOB shell, but the ASC tenant—a joint venture between Florida Hospital and several physicians—retained a separate architectural firm, Gordon and Associates ("Gordon"), and engineering firm, Meinhardt Engineering ("Meinhardt"), for the build-out of the ASC. In early 2006, during that tenant build-out, either the Osceola County Building Department ("OCBD") or the Florida Agency for Health Care Administration ("AHCA") rejected the plans submitted by Gordon and Meinhardt, in part based on "code violations involving the HVAC connections to the ASC

tenant space."[5]  (JPS ¶ 9(s)).

The code violation identified by the reviewing authority was noncompliance with section 421.3.6 of the Florida Building Code ("FBC"), which pertains to HVAC systems in ASCs and provides in pertinent part that "[i]n buildings with multiple uses, tenants or occupancies, the licensed health care areas required by this code to maintain filter efficiencies and relative air pressure relationships shall be served by separate ducted mechanical air supply, return and exhaust systems."  (FBC § 421.3.6, Joint Ex. 49).  Heery's design of the HVAC system for the MOB provided for three rooftop air handler units ("RTUs" or "AHUs") to supply air conditioning to the MOB.  One of these three AHUs—referred to by the parties as RTU 3—was to serve the entire fourth floor, with separate duct work for the ASC space and the non-ASC space on that floor.  Heery believed that this separate ducting complied with section 421.3.6's requirement of "separate ducted mechanical air supply, return and exhaust systems."  However, the reviewing authority interpreted the code as requiring not only separate duct work but also separate AHUs for ASC and non-ASC space; thus, the ASC plans were rejected during tenant build-out because of the single AHU serving the whole fourth floor.  Ultimately, in order to remedy the issue and obtain approval for the build-out of the ASC space, the ductwork running from RTU 3 to the non-ASC fourth floor space was capped, and another RTU was added to serve that non-ASC space.

2.  The Design of the HVAC System

─────────────────────

[5]The parties stipulated prior to trial that AHCA rejected the plans, (JPS ¶ 9(s)), but the trial evidence suggested that it was OCBD, not AHCA, that first noted the issue with the HVAC design; in any event, one of these two reviewing authorities disapproved the plans.

Heery completed its initial mechanical plans for the MOB shell—including the HVAC system plans—in 2004, and these plans were, along with Hunton Brady's architectural plans, approved by the OCBD in late 2004.  Construction of the MOB began in December 2004, and some HVAC equipment was ordered at that time.

Initially, the ASC was slated to occupy the entire fourth floor of the MOB, but in March 2005 the ASC tenant, after considering for some time changing both the size and the location of the ASC, made a final decision to downsize the ASC to encompass only about half of the fourth floor instead of the whole floor; the balance of the floor was then to be used by other, non-ASC tenants.  Once that decision was finalized, Hunton Brady and Heery were asked by Lillibridge to revise their drawings to take account of the reduced ASC footprint. Changes necessitated by the downsizing of the ASC included deletion of an elevator, addition of a corridor, and adjustments to the mechanical and electrical systems.  "Additional Service" agreements (Joint Exs. 17 & 22) were executed, and Hunton Brady and Heery were paid additional monies to revise their plans.  These revised plans were, like the original plans, submitted to and approved by OCBD.

Dick Snyder, Heery's project manager, testified that when the ASC was downsized, Heery had to go back and recalculate the anticipated loads for the fourth floor both electrically and mechanically.  In reassessing the mechanical requirements, Heery examined the building code and determined that although FBC section 421.3.6 specified a split system, that system could be a split duct system rather than a completely separate system with a separate AHU; thus, Heery redesigned the fourth floor HVAC system as a split-duct system with a single AHU.  The AHU—RTU 3—was not downsized due to the smaller ASC, but the

air flow—measured in cubic feet per minute (cfm)—was decreased.

Sam Siciliano, one of Heery's mechanical engineers on the project, testified that when Heery revised the fourth-floor HVAC plan, Heery designed it with split duct work from the same AHU because the AHU had been sized to handle the whole fourth floor from the beginning of the project; after the ASC was downsized, Heery kept the same size AHU—knowing that it would be able to service the whole area—and cut down the air flow by about five percent because the ASC—a type of use that requires a higher amount of ventilation and air conditioning load than, for example, an office space type of use—would not require as much for the smaller area that it was going to occupy.  It was Siciliano's interpretation of the building code that the AHU serving the ASC could serve the rest of the floor as well, even if that space was non-ASC tenant space.

Philip Taylor of Lillibridge testified that after the downsizing of the ASC, he noticed that Heery's revised drawings still indicated only one air handler for the entire fourth floor.  Taylor questioned this because in other states where Lillibridge has done projects that included ASCs, such a single air handler arrangement had been disallowed.  Taylor testified that either Snyder or Siciliano assured him during a meeting that a single air handler was allowed in Florida and that Heery did it that way all the time.  According to Taylor, Lillibridge relied on Heery's expertise in that regard.  This alleged statement forms the basis of the negligent misrepresentation count (Count V) of Lillibridge's Complaint.

Both Snyder and Siciliano deny making this statement, though they acknowledged that the way Heery designed the system was consistent with the sentiment that a single AHU for ASC and non-ASC space is permissible in Florida.  Chuck Cole of Hunton Brady also

denied hearing this statement at a meeting as alleged by Taylor.  However, Mark Stringer of Meinhardt—the engineering firm that was retained by the ASC tenant for the ASC build-out—testified that in the fall of 2005 he questioned Philip Taylor about the propriety of the single-RTU setup, and Taylor responded that he had had the same question but had been assured by Heery that it was acceptable.

 3.  Arguments and Analysis

 Heery maintains that it neither was negligent nor breached a contract with regard to the design of the HVAC system because its plans were submitted to and approved by OCBD.  Heery acknowledges that the contract documents required that its designs comply with codes, but Heery avers that the only codes applicable to its work were the codes pertaining to the MOB shell—not those that applied to ASC space that was to be built out later by a tenant.  Additionally, Heery argues that to the extent it was required to deliver a system that would later be approved by AHCA, it did all that it could toward that end by making a reasonable interpretation of the FBC, asserting that it was neither required nor able to submit its plans to AHCA.  Heery blames Meinhardt—the engineering firm for the tenant space—for the fact that the HVAC design was deemed noncompliant with code during build-out of the ASC.

 Lillibridge, on the other hand, argues that Heery is responsible for the HVAC system problem because Heery was obligated under the Contract and Subcontract to design a system that was appropriate for the intended use of the space, which was known from the outset by all parties to include an ASC on the fourth floor of the MOB.  Lillibridge asserts that it contracted for a functional and code-compliant HVAC system for a MOB that included an

ASC—a base system that would not require further upgrade or monetary expenditure during tenant build-out.  The Court agrees with Lillibridge.

Heery's position that it was not obligated to deliver an HVAC design that complied with the Building Code's requirements for ASCs is belied by the terms of the contracts, the testimony of the trial witnesses, and common sense.  As explained during trial testimony, including that of Philip Taylor, the tenant spaces have to tie in to systems that already exist in the shell building.  The shell building would include some base mechanical and electrical items that would be used by the ASC in the future because it would be difficult to retrofit those items later.  Lillibridge expected that the shell building was going to be designed to accommodate future tenants, including the ASC.

This expectation and understanding was known, and shared, by the other parties as well.   Chuck Cole, Hunton Brady's principal in charge of health care architecture, acknowledged during his testimony that the scope of services in the Contract included the specific intended use for the MOB to house an ASC, and under both the Contract and the Subcontract it was always the intent from day one that the core and shell building was to be designed to accommodate that ASC.  All of the obligations in the Contract were subject to the specified intent for the defined project, including the ASC that was going to be housed there in the future.  Heery's obligations under the Subcontract included providing engineering services related to the core and shell mechanical, electrical, and plumbing components, including the HVAC and electrical systems that were going to supply the tenant spaces in the building—including the ASC.  The fact that an ASC was going to be in the building had code implications with regard to the design of the core and shell, including implications as

to HVAC and electrical system components.

Additionally, although the original intention was for the ASC to occupy the entire fourth floor, it was known from the outset that the ASC might be downsized and even moved to a different part of the building.  Both Hunton Brady and Heery knew that sometime during the course of the project the ASC could be reduced in size and that this would result in multiple tenants occupying the fourth floor; this change would have code implications, including for the HVAC and electrical systems that were part of the core and shell.  In that event, Heery would be required to accommodate its designs for those code implications.

As Cole explained, after the decision was made to downsize the ASC, Hunton Brady and Heery had to evaluate what needed to be done in order to accommodate a reduced-size ASC within the core and shell.  This necessarily included reviewing codes to see if the reduction in ASC size required different things with regard to the components of the core and shell that would tie in to the ASC Cole's expectation was that Heery would review the code implications of a reduced ASC space and multiple tenants occupying the fourth floor.

It is clear that Heery understood that the HVAC system needed to be able to serve the ASC, and even though Heery was not required to submit its plans to AHCA because the MOB shell was not a licensed healthcare space, Hunton Brady and Heery knew that when the ASC was later built out, AHCA would be reviewing components of the core and shell, including the HVAC system.  Hunton Brady and Heery knew that if those core and shell components were not in compliance with the Florida Building Code as it pertained to AHCA-regulated space, the tenant fit-out plan would be rejected.

Heery's own witnesses acknowledged their awareness of the intended use of the

-11-

space as an ASC.  Snyder, Heery's project manager, testified that he knew from the terms of the Contract that there was going to be an ASC on the fourth floor of the MOB, and he acknowledged that when the ASC was reduced in size, Heery needed to do whatever was necessary to ensure that the engineering work incorporated how the code would be applied to it.  Indeed, Heery attempted to deliver a system that met code in that regard. Both Snyder and Siciliano testified that Heery did review the code and came to the conclusion that section 421.3.6 allowed for the whole floor to be served by a single AHU so long as the spaces were separately ducted.  However, the reviewing authority did not agree with that conclusion, and it disallowed the tenant build-out because of the way the core and shell HVAC system had been designed.

After Lillibridge learned of the problem with the ASC approval during tenant build-out, it looked to Hunton Brady and Heery to resolve it.  Upon being informed of the issue, Siciliano and Snyder maintained that Heery's design was compliant with code.  However, after they met with AHCA and explained Heery's position, they learned that AHCA required not only separate ductwork but separate AHUs; Siciliano explained the reason for this requirement in an email, stating: "[H]istorically, in multi-tenant office type buildings, after the ASCs were licensed, there was no control over adjacent tenant space configurations.  These adjacent spaces would be built-out and configured in such a way as to overcome the remaining available capacity of the existing AHU.  The ASC portion of the area suffered an HVAC capacity reduction and therefore reduced operational efficiencies."  (Joint Ex. 26).

In sum, although Hunton Brady and Heery are correct that they were only responsible for architectural and engineering services for the MOB shell and core—not the tenant spaces

in the building—it was plainly contemplated by all parties involved from the outset of the project that the MOB would eventually contain an ASC and that the shell building needed to be suitable for that purpose.  It is not a reasonable reading of the contracts to find that Lillibridge or any third party was to be expected—after Hunton Brady and Heery's design work was complete—to have to spend more money to install additional HVAC equipment in order to render the shell HVAC system compliant with code for the known, intended use of tenant space.

Heery's argument that its provision of engineering services did not fall below the relevant standard of care misses the mark.  Heery is correct that several engineers testified that the Building Code provision at issue was "subject to interpretation."  However, Heery's own mechancial engineering expert, Joseph DiGuglielmo, testified that he knew that AHCA's interpretation of section 421.3.6 was that separate AHUs were required for ASC space and non-ASC space; according to DiGuglielmo, an engineer in Florida who was familiar with this type of issue would know that that was how AHCA interpreted that provision.  Heery was bound in this case to exercise "the standard of care used by similar professionals in the community" and also to comply with the requirements of the contracts.  Cf. CH2M Hill Southeast, Inc. v. Pinellas Cnty., 698 So. 2d 1238, 1240 (Fla. 2d DCA 1997) ("Generally, the legal duty imposed upon professionals who contract to provide services is to perform such services in accordance with the standard of care used by similar professionals in the community.  Additionally, if the professional contracts to perform duties beyond those required by ordinary standards of care, the quality of that performance must comport with the contractual terms.").  In short, Heery's design did not provide Lillibridge what it contracted

-13-

for, and thus Lillibridge is entitled to recover damages.

### 4. Damages

As noted earlier, Lillibridge ultimately remedied the HVAC issue by having an additional RTU added to the roof of the MOB to serve the non-ASC portion of the fourth floor. Lillibridge established at trial that in doing so, it expended a total of $245,982.37:  $450 to disconnect duct work; $66,709 ($62,750 unit price plus $3,959 in sales tax) for the fourth RTU that was added to the roof; $3,336.80 for services of Meinhardt; $3,015.57 for structural engineering services of another firm; and $172,471 for structural modifications to the building so that the fourth RTU could be added.  (Joint Exs. 38, 41, 42, & 43; Pl.'s Ex. 2).  Heery does not contest that Lillibridge spent this amount, but Heery contends that Lillibridge is not entitled to recover all of this amount because if the system had been designed correctly at the beginning, Lillibridge would still have had to expend some money for equipment.

Heery relies on Lochrane Engineering, Inc. v. Willingham Real Growth Investment Fund, Ltd., 552 So. 2d 228 (Fla. 5th DCA 1989), in which the court gave an example of the appropriate measure of damages for an engineering error.  The Lochrane court explained that if an engineer who was retained to design a drain field designed a 1,000-square-foot drain field but a 1,200-square-foot drain field was later determined to be required, the engineer would not necessarily be liable to the owner for the full cost of installing the additional 200 feet of drain field because if the engineer had designed the field correctly the first time, the owner would have had to pay for that extra 200 feet anyway.  Id. at 232-33. Citing this example, Heery contends that if the fourth RTU had been included in Heery's original design, Lillibridge would have had to pay for it at that point, and thus, argues Heery,

Lillibridge should not be able to recoup the cost of the fourth RTU now.

The problem with Heery's argument, however, is that it was not established at trial that the fourth RTU would have been necessary if the HVAC design for the MOB shell had been compliant in the first instance. The evidence was somewhat conflicting on this point.

Philip Taylor of Lillibridge testified that by March 2005 when the final decision was made to downsize the ASC, construction of the MOB shell had been underway for four months and the order for the original RTUs had already been placed. Based on Siciliano's revised calculations for the RTU requirements, Lillibridge stopped the order on the mechanical system and issued a new purchase order to Trane. The chiller was downsized, but the AHU was still intended to serve the top floor. Taylor thinks that if the AHCA requirement of a separate AHU for the rest of the fourth floor had been known in March 2005, Lillibridge could have changed the capacities of the other units to cover the non-ASC fourth floor space.

However, when the problem emerged in 2006 and solutions were sought, both Meinhardt and Heery told Taylor that another RTU would have to be added to serve the non-ASC space. Taylor looked for the least expensive way to resolve the issue. Lillibridge asked Trane if one of the existing RTUs could be upsized by, for example, changing fans, but Trane responded that the capacity could not be increased enough without replacing the unit, which was not practical because of tenants using the air conditioning at that time. They also looked into "stealing" air from the other RTUs, but the capacity was not there to be able to do that; the response from everyone was that adding another RTU was the only way to go at that point.

According to Dick Snyder of Heery, if RTU 3 had been identified originally as being for the ASC space only, the other two RTUs would have had sufficient capacity to service the balance of the building.  This testimony from one of Heery's employees suggests that the fourth RTU would not have had to have been added if RTU 3 had been dedicated to only the ASC in the first place.

Siciliano testified that after the problem with AHCA emerged during tenant fit-out, Heery put together a design to add a separate AHU to service the non-ASC areas of the fourth floor.  According to Siciliano, Heery did not evaluate whether the other RTUs could serve the balance of the fourth floor as well as the spaces they were intended to serve.  Siciliano opined that those units probably would not have been able to do so, but he acknowledged that he did not know whether in fact the existing systems could have been increased to serve the balance of the fourth floor if Heery had interpreted the code in March 2005 the way that the reviewing authority did.

In sum, the evidence was not clear as to whether the fourth RTU would have been needed in the original design or whether the other RTUs could have been modified in some way to serve the non-ASC portion of the fourth floor.  Lillibridge argued during closing that it is the Defendants' burden—not Lillibridge's—to establish that the costs that Lillibridge incurred in resolving the issue were duplicative of costs it would have occurred originally.  The Court agrees.  Lillibridge established what it actually paid to remedy the HVAC issue, and if Defendants believed that only a lesser amount was recoverable, they should have established the extent to which Lillibridge's claimed damages were excessive.  They did not do so.  Thus, Lillibridge is entitled to a damages award of $245,982.37 on the HVAC issue.

B.  The GFI Error

1.  Overview of the Problem

Like the HVAC error, the second issue—the GFI error—also derives from the presence of the ASC in the MOB.  During the tenant fit-out of the ASC, AHCA required that a second level of ground-fault interruption ("GFI") protection be added to the circuit breakers in the main electrical distribution panel of the MOB because the electrical code required this second level of GFI in buildings with ASCs.  In order for this second level of GFI protection to be added, eight circuit breakers in the main distribution panel had to be replaced at a cost of $47,729—$42,729 for replacement of the breakers and $5000 to add a panel section to accommodate the new, larger breakers.  (Purchase Order, Joint Ex. 39).  Lillibridge seeks to recover nearly all of this amount, asserting that Heery approved installation of a type of equipment that caused Lillibridge to expend significantly more than otherwise would have been necessary to add GFI protection.

2.  Trial Evidence

The Project Specifications for electrical equipment in the MOB provided in part: "Switchboards shall be Square D Power-Style."  (Joint Ex. 52 at 16300-7).  Dick Snyder of Heery explained during his trial testimony that Square D is the manufacturer's name and that this was a sole-source specification, meaning that Square D was the only acceptable vendor for this equipment.  The specified Square D equipment had circuit breakers that could accommodate a later addition of GFI protection via a module that easily plugged into the back.  In contrast, molded-case type breakers would not have that capability for later addition of GFI protection; instead, molded-case breakers might require replacement in order to add

-17-

GFI protection.

Although Square D was the specified manufacturer, during construction the general contractor selected switchboard equipment not from Square D but from another manufacturer—Siemens.  The Siemens equipment that the contractor proposed included molded-case breakers rather than the type that facilitated GFI additions with a plug-in module.  When the Siemens equipment was submitted for Heery's approval, Heery's electrical engineer, Jon Candor, initially rejected it because the specification was for Square D equipment, not Siemens equipment.  Candor noted this rejection by indicating "not approved" on the submittal review stamp.  (Attach. A to Joint Ex. 8).

After Heery refused to approve the Siemens switchboard that the contractor submitted, a Lillibridge representative, Keith Klingsporn, contacted Heery by telephone, stated that the Siemens board was already being fabricated, and asked whether there was any way that Heery could approve it.  Candor then changed the lack of approval on the submittal to "approved as noted," with a note to a Hunton Brady employee that stated in part: "Regarding the submittal for switchboards and panelboards, please ensure the following: . . . The branch circuit breaker feeding Panel N41 should be provided with ground fault protection.  (verify that ground fault protection is available as an add on for all branch breakers if necessary).  NOTE: The ground fault issue is of concern based on the fact that future tenant projects may be required to meet AHCA approval which states that there be two levels of ground fault protection."  With this notation, Candor approved the submission and the Siemens equipment was installed in the building.

Approximately a year later, during tenant fit-out, AHCA required additional GFI

protection on all of the circuit breakers in the main distribution panel, "NDP1."  Eight molded-case type circuit breakers in NDP1 had to be replaced at a cost of $47,729.  If the Square D equipment—with its plug-in module capability—had been installed, the cost to add the GFI protection to the breakers would have been only $5,834.  Lillibridge acknowledges that it would have had to pay $5,834 to add the GFI even if the specified Square D equipment had been installed, and it seeks to recover the $41,895 difference as damages for the GFI error.

### 3.  Arguments and Analysis

Heery contends that it cannot be held responsible for the cost difference for adding the GFI protection because it accepted the Siemens product only after Lillibridge asked it to do so.  Heery emphasizes that it initially rejected the contractor's submission of the Siemens board based on the sole-source specification for Square D equipment and only indicated its approval after being urged to do so by Lillibridge—which retained substitution-approval authority in the Contract—and after Candor wrote a note regarding the future need for GFI protection.  Lillibridge, however, asserts that Heery is responsible for the $41,895 cost difference because Heery did not explain the consequences of the substitution to Lillibridge when the contractor submitted the Siemens equipment and because Heery knew that additional GFI protection was going to be added later.  Based on the evidence presented at trial, the Court is persuaded by Lillibridge's argument on this point.

Heery is correct in noting that the Contract did not allow substitutions of equipment without Lillibridge's approval; this was acknowledged by Phillip Taylor at trial.  However, Taylor explained that Lillibridge retained substitution-approval power as a means of controlling costs and aesthetics on the project—not as a way to supplant the expertise of the

hired consultants.   Lillibridge did not review submittals for the purpose of determining whether they met the specification; Lillibridge relied on the architects and engineers to do that.   It remained the responsibility of the design professionals hired for the project to determine whether product submittals were appropriate and should be approved.

Although Heery asserts that it approved the Siemens equipment only at the behest of Lillibridge, it was still Heery—not Lillibridge—that approved the substitution.  Dick Snyder testified that a Lillibridge representative called and asked if there was any way that Heery could approve the substitution—not that the representative directed Heery to go ahead and approve it because Lillibridge said so.  The question asked by the Lillibridge representative, as recounted by Snyder, still called for Heery to make a determination as to the propriety of the substitution.   Heery then wrote a note regarding the future need for ground fault protection and approved the substitution of the Siemens product.

There are several problems with Heery's attempted reliance on Candor's note, however.  First, it was far from clear at trial that the note was received by Lillibridge at any meaningful time.  The note was written to a Hunton Brady representative, and as explained by Snyder, the note would alert a successor engineer doing work in the building that he needed to be prepared to look at that particular item; according to Snyder, the engineer responsible for the tenant fit-out would have to verify that ground fault was available as an add on.  Snyder felt that Heery's note indicated *to a future engineer on the project* that ground fault could be an issue.  The note was directed to a future engineer, not to Lillibridge. There was no testimony that the note was seen by anyone at Lillibridge at the time of the substitution.  Philip Taylor did not recall seeing the note at the time, though he did testify that

the note was in Lillibridge's project file when the issue came to a head a year later.

Even if Candor's note had been given to Lillibridge at the time, the note does not convey the significance of the equipment substitution.  Taylor explained that a second level of GFI was not added at the time the MOB was constructed because Lillibridge was under the impression that it could be added later without significant additional cost—as would have been the case if the Square D switchboard had been installed.  Candor's note "to a future engineer" did not apprise Lillibridge of the financial ramifications of using this type of switchboard instead of the item called for in the specifications; the note does not explain that the breakers would have to be replaced later in order for GFI protection to be added.  As acknowledged by Snyder at trial, Heery never advised Lillibridge or even Hunton Brady what the cost would be to replace the Siemens equipment later when a second level of ground fault protection needed to be added.  Taylor credibly testified that if Lillibridge had known that the breakers would have to be completely replaced later, the Siemens substitution would not have been allowed.

Heery clearly understood that the breakers in the Siemens panel did not have the same plug-in capability as the Square D product, but Lillibridge did not—until a year later, when it had to spend more than $40,000 to replace eight circuit breakers.  In sum, Heery approved installation of a product that was not the equivalent of what was specified and which caused significant increased cost to Lillibridge.  Lillibridge has established entitlement to damages of $41,895 with regard to this error.[6]

_____

[6]There was also testimony at trial regarding a change to section 517.17 of the National Electric Code that affected the GFI protection requirements for the building.  There

### C.  The Porte Cochère Lighting Error

The third and final issue pertains to pendant light fixtures that were hung in the porte cochère area outside the MOB.  These hanging fixtures with 36-inch stems were struck by delivery trucks shortly after the building opened.  As a result, the fixtures were broken and had to be replaced.  Lillibridge faults Defendants for the lighting specification and seeks to recover the $5480 that it paid to replace these fixtures.  Defendants, on the other hand, contend that the clearance and hanging of the fixtures is a "means and methods issue" that was the responsibility of the general contractor on the site.  The Court concludes that Lillibridge failed to establish at trial that either of the Defendants was responsible for the porte cochère fixture problem, and thus Lillibridge shall recover no damages in connection with this issue.

The trial testimony established that Robert Stern, the initial architect for the MOB, had recommended some light fixtures for the exterior of the MOB that would match those of the adjacent hospital.  Heery took Stern's specifications and put them on Heery's schedules so that the contractor knew what to purchase.  However, the fixture that Stern specified was

_____

was testimony that under the 2002 version of the NEC, the only breakers in the main panel that needed additional GFI protection were those feeding the ASC, but under the 2005 version, all breakers in the main panel needed the additional protection.  Thus, Heery asserts that the code change in the interim between the MOB construction and the tenant build-out created this issue.  However, the problem was created when Heery allowed the Siemens equipment to be installed, knowing that the future ASC would require more GFI protection. Although the code change may have increased the number of breakers that had to be replaced—the remedy for the problem—the code change did not affect the creation of the problem by Heery in the first instance.  The Siemens board would have resulted in avoidable increased expense to Lillibridge under either version of the NEC; the new code merely increased the cost of the remedy, and the Court finds that Lillibridge may properly recover the full amount of the difference in the cost of upgrading the GFI protection.

discontinued, and the contractor then submitted a Request for Information ("RFI") to Hunton Brady, which in turn submitted it to Heery, to find a substitute fixture that would keep the desired look.  (Joint Ex. 19).  A Heery engineer responded to that RFI by noting that substitutions were being reviewed by the architect, (see Joint Ex. 19), and there is no evidence that Heery was ever involved with these light fixtures again in any way.

Hunton Brady did specify substitute light fixtures in response to the RFI.  (See Joint Ex. 44).  However, Lillibridge did not establish that this act renders Hunton Brady at fault for the improper clearance.  Lillibridge asserts that no clearance was specified for the fixtures and that thus Hunton Brady's error was an omission rather than an affirmative act.  However, the most that the trial evidence established was that Hunton Brady specified an aesthetically similar fixture to substitute for the one that Stern had originally selected but which was discontinued.  No evidence was presented as to whose responsibility it was to assure proper clearances, nor was evidence presented as to the dimensions of the original fixtures that had been specified by Stern.  As far as the Court can tell, Hunton Brady merely selected an equivalent light fixture to what had previously been chosen.  This does not render Hunton Brady responsible for the cost of replacing the damaged fixtures.

In sum, the issue may have been a "means and methods" issue for the contractor or an issue as to responsibility for specifying clearances in the porte cochère area.  The Court cannot determine which, but it does determine that Lillibridge did not establish that either of these Defendants bears responsibility for the problem.

<u>III.  Theories of Recovery</u>

As earlier noted, Lillibridge alleged five counts in its Complaint, four of which remain:

a breach of contract claim against Hunton Brady (Count I); a breach of contract claim against Heery (Count III); a negligent design claim against Heery (Count IV); and a negligent misrepresentation claim against Heery (Count V).  While Count V pertains specifically to the alleged misrepresentation made by a Heery representative to Philip Taylor during a meeting, the other three counts relate more generally and collectively to the three errors discussed above.  The viability of Lillibridge's theories of recovery must be analyzed on a count-by-count basis.

A.  Count I—Breach of Contract Against Hunton Brady

In Count I of the Complaint, Lillibridge brings a claim of breach of contract against Hunton Brady.  Lillibridge alleges that Hunton Brady breached the main Contract by, inter alia, "failing to provide Lillibridge with mechanical, electrical and lighting plans, specifications and designs that comply with all applicable codes and are otherwise proper for inclusion and construction in the Project."  (Compl. ¶ 48).  Hunton Brady asserts that it cannot be held responsible for Heery's errors, but the Court disagrees.

The Contract obligated Hunton Brady to provide Lillibridge with "structural, architectural, electrical, mechanical and plumbing plans," (Contract at "Page 1 of 11"), and required Hunton Brady and its consultants to "review all shop drawings and submittals for compliance with the information given and the design concept expressed in the Construction Drawings during the construction phase of the Project," (id. at "Page 3 of 11").  Although the Contract contemplated that Hunton Brady would retain consultants—including an engineering consultant—in order to comply with its obligations, Hunton Brady remained contractually obligated to provide these services nonetheless.  As discussed earlier, because

of the HVAC error—a problem with the mechanical plans—and the GFI error—a problem with conformity of the installed electrical equipment to the intended purpose of the building—Lillibridge did not receive a MOB suitable for its intended partial use as an ASC as it was promised in the Contract.  Thus, the Contract was breached.  Cf. Owings v. Rose, 497 P.2d 1183, 1186 (Or. 1972) (noting that architects agreed in their contract "to render all architectural and engineering services necessary in the design of the new plant and were thus obligated to furnish . . . engineering service of reasonable quality"; thus, architects were liable even though they were not personally at fault where engineering services were defective).  The fact that Hunton Brady is liable for breach of contract, however, does not leave Hunton Brady without recourse.  Hunton Brady has brought a crossclaim against Heery for indemnity, which is discussed later.

B.  Count III—Breach of Contract Against Heery

In Count III, Lillibridge brings a breach of contract claim against Heery.  It is undisputed that Lillibridge and Heery did not directly enter into a contract with one another.  Consequently, Lillibridge's breach of contract claim against Heery is brought on the basis that Lillibridge is allegedly an intended, rather than incidental, beneficiary of the Subcontract between Hunton Brady and Heery.

"'A third party is an intended beneficiary, and thus able to sue on a contract, only if the parties to the contract intended to primarily and directly benefit the third party.'" Cigna Fire Underwriters Ins. Co. v. Leonard, 645 So. 2d 28, 29 (Fla. 4th DCA 1994) (quoting Md. Cas. Co. v. State Dep't of Gen. Servs., 489 So. 2d 57, 58 (Fla. 2d DCA 1986)).  Thus, "'[t]he right of a third party beneficiary to sue under a contract is recognized in Florida, but that right

is limited to those situations where the provisions of the contract clearly show an intention primarily and directly to benefit the individual bringing the suit or to a class of persons to which he claims to belong as a third party beneficiary.'" Id. (quoting Sec. Mut. Cas. Co. v. Pacura, 402 So. 2d 1266, 1267 (Fla. 3d DCA 1981)).

The parties have not extensively addressed the issue of whether Lillibridge is an intended third party beneficiary of the Subcontract.  In its motion for summary judgment, Heery argued that Lillibridge was not such a beneficiary only on the basis that the main Contract had been entered into between MMBC and Hunton Brady rather than Lillibridge and Hunton Brady.  The Court rejected that argument, noting that Heery had not cited any authority for the proposition that a successor in interest would not acquire the same status as its predecessor.  (See Order, Doc. 67, at 6-7).

Generally, an owner or contractor is not regarded as an intended third-party beneficiary of a subcontract.  See, e.g., J.W. Hodges Drywall, Inc. v. Mizner Falls LLP, 865 So. 2d 681, 682 (Fla. 4th DCA 2004) ("Nor is a property owner generally considered a third party beneficiary of a contract between a general contractor and a subcontractor."); accord Horizon Images, Inc. v. Delta Color Graphics, Inc., 639 So. 2d 186, 187 (Fla. 4th DCA 1994) ("Our reversal should not be construed as a holding that one who purchases a product from a contractor, produced in part by subcontractors, can always sue the subcontractors as a third party beneficiary, because this is not the law.").

On similar facts, Florida's Second District Court of Appeal rejected an attempt by a municipality to assert third-party beneficiary status against an engineering firm that had subcontracted with an architectural firm with whom the municipality was in direct privity.  In

City of Tampa v. Thornton-Tomasetti, P.C., 646 So. 2d 279 (Fla. 2d DCA 1994), the court noted that Florida "courts have been reluctant to expand the privity exception to an incidental third party beneficiary, such as the City" and that that "[i]t is not enough that the professional services ultimately rendered accrue to the owner."  Id. at 282-83.  Emphasizing that "[t]he intention of the contracting parties, gleaned from the contract itself, is determinative" and finding that "[i]t is evident from the agreements that the [engineering] consultants' contractual responsibilities were confined to the architects and did not extend to the city," the Thornton-Tomasetti court concluded that "[a]t best, the City was a remote or incidental beneficiary of the consultants' obligations to the architects."  Id. at 282-83.  The court affirmed dismissal of the City's breach-of-contract claim against the engineering firm.

The same result must obtain here.  Lillibridge has not established that it enjoys intended third-party beneficiary status with regard to the Subcontract.  Although Lillibridge was certainly an incidental beneficiary of the Subcontract, the intention of the parties to the Subcontract—Hunton Brady and Heery—as expressed in the document does not support third-party beneficiary status for Lillibridge.  The Subcontract expressly states:  "Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either [Hunton Brady] or [Heery]."  (Subcontract at 13).  Although the Subcontract does incorporate the main Contract, such incorporation serves to define the project and the scope of Heery's obligations to Hunton Brady—not to render Lillibridge an intended third-party beneficiary.  In light of the express provision in the Subcontract disavowing creation of contract rights in favor of any third party, the Court concludes that Lillibridge may not recover from Heery directly for breach of contract on a

third-party beneficiary theory.

### C.  Counts IV and V—Negligent Design and Negligent Misrepresentation Against Heery

In Count IV, Lillibridge alleges a claim of negligent design against Heery, and in Count V, Lillibridge makes a claim of negligent misrepresentation against Heery based on the statement allegedly made during a meeting by a Heery employee—either Snyder or Siciliano—regarding the propriety of one AHU serving both ASC space and non-ASC space. Both of these claims, however, are duplicative of the breach of contract claims already alleged by Lillibridge.  The negligence that is alleged is the same conduct that is alleged to have amounted to a breach of contract, and the same economic losses are sought.  For example, as noted by Heery, the negligent misrepresentation claim does not allege a misrepresentation independent of Heery's obligations under the Subcontract and thus is not actionable as a negligence claim.[7]  Cf. Vesta Constr. & Design, L.L.C. v. Lotspeich & Assocs., Inc., 974 So. 2d 1176, 1181 (Fla. 5th DCA 2008) (noting that "a distinction is drawn between misrepresentations that are directly related to the breaching party's performance of the contract and those which are independent of the contract").  And, Lillibridge may not overcome its lack of third-party beneficiary status by calling a breach of contract claim a negligence claim.  See Thornton-Tomasetti, 646 So. 2d at 282 (finding that City could not sue engineering firm for negligence and that "only the architects were answerable to the City

_____

[7]The evidence was conflicting on whether this statement was made; Taylor testified that it was made, but neither Cole, Snyder, nor Siciliano recalled such a statement being made at a meeting.  The Court need not resolve this conflicting evidence, however, because this claim is duplicative of the others; the negligence alleged is part and parcel of the alleged breach of contractual duties.

for deficiencies in design or performance").

This case is clearly a contract-based case, and the negligence counts are duplicative of the breach of contract counts.[8]  Here, there were two agreements—the main Contract between Lillibridge and Hunton Brady and the Subcontract between Hunton Brady and Heery—that cover the MOB project.  The errors are derived from obligations imposed by the contracts and not from any other source.  Under these circumstances, negligence counts will not lie.  See, e.g., Weimar v. Yacht Club Point Estates, Inc., 223 So. 2d 100, 103 (Fla. 4th DCA 1969) ("[N]o cause of action in tort can arise from a breach of duty existing by virtue of contract.");  accord Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co., 482 So. 2d 518, 519 (Fla. 3d DCA 1986) ("It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence.").  Thus, Lillibridge is not entitled to any relief on the negligence counts set forth in Count IV or V, and any recovery it obtains must be on its breach of contract claim against Hunton Brady in Count I.

D.  Hunton Brady's Crossclaim Against Heery

Hunton Brady has brought a crossclaim against Heery for common law indemnity, asserting that "[s]hould it be found that Hunton Brady is liable to Plaintiff, that liability is only vicarious, constructive, derivative or technical and arises because of the special relationship between Hunton Brady and Heery."  (Am. Cross-cl., Doc. 15, at 3).  "In order to prevail on a common law indemnity claim, the following two-pronged test must be satisfied:  (1) the

---

[8]This reasoning would apply as well to the negligence count against Hunton Brady in Count II.  However, Lillibridge has already voluntarily dismissed that count.

party seeking indemnity (the indemnitee) must be without fault and its liability must be solely vicarious for the wrongdoing of another, and (2) the party against whom indemnity is sought (the indemnitor) must be wholly at fault."  Heapy Eng'g, LLP v. Pure Lodging, Ltd., 849 So. 2d 424, 425 (Fla. 1st DCA 2003).

The evidence at trial established that the errors that caused damage to Lillibridge—the HVAC error and the GFI error—were the errors of Heery, not of Hunton Brady.  There was no evidence that Hunton Brady was at fault with regard to the HVAC error or the GFI error, and Hunton Brady was entitled to rely on the expertise of Heery with regard to those issues.  Thus, Hunton Brady's liability to Lillibridge is merely derivative, and Hunton Brady is entitled to be indemnified by Heery for the sums it owes to Lillibridge.  See, e.g., Owings, 497 P.2d at 1186-87 (affirming award of indemnity to architect against structural engineer that it hired as a consultant, where architect had settled claim with owner regarding cracks in concrete floor).

## IV.  Motions

### A.  Hunton Brady's Rule 52(c) Motion

On the third day of trial, after Lillibridge had rested its case, Hunton Brady moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).[9]  This rule provides in pertinent part that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated

---

[9]The motion was made and argued orally, and a written motion (Doc. 79) was also filed.

only with a favorable finding on that issue."  The Court took Hunton Brady's motion—which raised four[10] distinct issues—under advisement, and the following ruling is now issued.

### 1.  Statute of Limitations

Hunton Brady first asserts entitlement to judgment in its favor based on the statute of limitations.  Hunton Brady argues that the case is barred by the two-year statute of limitations set forth in paragraph 95.11(4)(a), Florida Statutes.  Lillibridge, however, asserts that the four-year limitations period of paragraph 95.11(3)(c), Florida Statutes, is the appropriate limitations period and that thus the case was timely filed.

Paragraph 95.11(4)(a), upon which Hunton Brady relies, provides that "[a]n action for professional malpractice, other than medical malpractice, whether founded on contract or tort," must be brought within two years, "provided that the period of limitations shall run from the time the cause of action is discovered or should have been discovered with the exercise of due diligence."  This two-year limitations period is limited, however, "to persons in privity with the professional."   Id.   The provision on which Lillibridge relies—paragraph 95.11(3)(c)—provides that "[a]n action founded on the design, planning, or construction of an improvement to real property" must be brought within four years, "with the time running from the date of actual possession by the owner, the date of the issuance of a certificate of occupancy, the date of abandonment of construction if not completed, or the date of completion or termination of the contract between the professional engineer, registered

---

[10]The written motion asserts a fifth argument—that there was no evidence that Hunton Brady breached the architectural standard of care—however, Lillibridge dismissed the professional negligence claim against Hunton Brady before the motion was argued in court, and that portion of the written motion was rendered moot.

architect, or licensed contractor and his or her employer, whichever date is latest; except that, when the action involves a latent defect, the time runs from the time the defect was discovered or should have been discovered with the exercise of reasonable diligence."  § 95.11(3)(c), Fla. Stat.

In arguing that paragraph (4)(a) governs this case, Hunton Brady relies on two cases. First, Hunton Brady cites Sheils v. Jack Eckerd Corp., 560 So. 2d 361, 363 (Fla. 2d DCA 1990), for the principle that "a specific statute of limitations addressing itself to a specific matter takes precedence over a more general statute of limitations even though the specific statute provides for a shorter period of limitations."  Second, Hunton Brady cites Baker County Medical Services, Inc. v. Summit Smith L.L.C., No. 3:05-cv-541-J-33HTS, 2008 WL 2245587, at *14 (M.D. Fla. May 29, 2008) (Covington, J.), a case involving the design, furnishing, and installation of an HVAC system in a hospital in which the court found that the two-year professional malpractice limitation in paragraph (4)(a) was a "more specific statute" than paragraph (3)(c) and applied that shorter period in finding some claims barred. Lillibridge responds that the Baker court erred in its analysis of this point and that Florida courts—to which this Court must defer on issues of state law[11]—have repeatedly applied paragraph (3)(c) rather than (4)(a) in suits against architects and engineers.  This Court agrees with Lillibridge.[12]

_____

[11]In applying state law, this Court, as a federal court situated in Florida, "must follow the decisions of the Florida Supreme Court and Florida's intermediate appellate courts." Prime Ins. Syndicate, Inc. v. Soil Tech Distribs., Inc., 270 F. App'x 962, 964 (11th Cir. 2008).

[12]The discussion in the text assumes for the sake of argument that this case can be characterized as a "professional malpractice" case against Hunton Brady at this point at all.

In <u>School Board of Seminole County v. GAF Corp.</u>, 413 So. 2d 1208 (Fla. 5th DCA 1982), the school board appealed the trial court's determination that its claims against an architect with whom it had contracted were barred by the four-year statute of limitations in paragraph (3)(c).   The Fifth District Court of Appeal agreed with the lower court's determination that paragraph (3)(c)—rather than paragraph (4)(a)—applied, expressly stating that "[t]he language of the four-year statute is much more specifically applicable to these suits against [the architect] than the two-year statute, which generally references 'professional malpractice' suits." <u>Id.</u> at 1210.  The court then reversed the trial court's grant of summary judgment against the School Board, finding that genuine issues of material fact remained with regard to the running of the statute.  In the appeal of the Fifth District Court of Appeal's decision, the Supreme Court of Florida stated in a footnote:  "[The architect] argues that the 2-year statute of limitations in § 95.11(4)(a) . . . should apply.  Both the trial court and the fifth district found the 4-year statute applicable, and we agree with the district court that the language of (3)(c), rather than (4)(a), is more specifically applicable to this case." <u>Kelley v. Sch. Bd. of Seminole County</u>, 435 So. 2d 804, 805 n.2 (Fla. 1983).

In response to Lillibridge's reliance on <u>Kelley</u>, Hunton Brady's counsel argued in court that the <u>Kelley</u> case is "almost thirty years old," that the court was not presented with a question of whether a two-year or four-year statute applied, and that the statement relied upon by Lillibridge was "only a footnote."  However, regardless of how "old" the case is or

---

The negligent design count against Hunton Brady has been dismissed, and Lillibridge does not allege the Hunton Brady breached the architectural standard of care—only that the Contract was breached due to problems with Heery's provision of engineering services.

whether this statement appeared in a footnote or the text of the opinion, the <u>Kelley</u> court expressly agreed with the Fifth District Court of Appeal's determination of which limitations period applied.  Moreover, even assuming that the Supreme Court's statement in <u>Kelley</u> was not clear enough on this point,[13] the statement of the Fifth District certainly was, and its ruling would bind this Court in any event.  <u>See</u> <u>McMahan v. Toto</u>, 311 F.3d 1077, 1080 (11th Cir. 2002) ("[A]bsent a decision from the state supreme court on an issue of state law, [federal courts in Florida] are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently.").

Thus, this Court concludes that the law of Florida is that the four-year statute of limitations in paragraph 95.11(3)(c), rather than the two-year statute of limitations in paragraph 95.11(4)(a), applies to actions such as the instant case and that Lillibridge's claims are not time-barred.

2.  Independent Contractor

---

[13]Additionally, the Supreme Court of Florida suggested in a later case—again, in a footnote—that its view is that paragraph 95.11(3)(c), rather than paragraph 95.11(4)(a), applies to claims against architects.  In <u>Pierce v. AALL Insurance Inc.</u>, 531 So. 2d 84 (Fla. 1988), the court addressed the issue of whether an insurance agent was a "professional" for purposes of the "professional malpractice" statute of limitations in paragraph 95.11(4)(a). In the course of answering that question in the negative, the court defined "a profession as a vocation requiring as a minimum standard, a college degree in the specified field." <u>Id.</u> at 87.  The court then listed examples of such professions—including architecture—but then stated that "[w]hile architecture is a profession under our definition, the statute of limitations for the design and construction of improvements to real property is four years, § 95.11(3)(c)." <u>Id.</u> n.2.  Seemingly, the Court was explaining that even though architecture fits within its definition of "profession" for purposes of paragraph (4)(a), claims against architects are governed by paragraph (3)(c) instead.

Hunton Brady also argued in its Rule 52(c) motion that it is not responsible for the acts of Heery, an independent contractor.  Hunton Brady cites two cases in support of this contention, but neither is germane to this case.  In the first, Century Land Development, L.P. v. Weits, No. 07-14377-CIV, 2009 WL 252091, at *4-5 (S.D. Fla. Feb. 2, 2009), the court noted that "[g]enerally, an employer is not liable for the torts of an independent contractor" and then found that a realty company was not vicariously liable for the negligence of a realtor with whom it had entered into an independent contractor agreement.  However, the case at bar does not involve an employment setting, and Weits is of no assistance here.  In the second, Carrasquillo v. Holiday Carpet Service, Inc., 615 So. 2d 862 (Fla. 3d DCA 1993), an employee of a hotel tripped and fell on some recently-installed carpet at the hotel and sued the general contractor who had hired an independent contractor to install the carpet. The court found the general contractor not liable for the subcontractor's negligence, but this result does not aid Hunton Brady here.  The Carrasquillo court noted that "the mere fact that there is a contract does not create a nondelegable duty vis-a-vis third persons," id. at 863, and that case obviously involved personal injury by a third party rather than a dispute regarding quality of services provided as between contracting parties.

The Carrasquillo court distinguished Mills v. Krauss, 114 So. 2d 817 (Fla. 2d DCA 1959), a case which is more on point.  In Mills, a general contractor who had been hired to perform repair work at a hotel was sued by the hotel when the roof leaked and caused damage.   The general contractor settled with the hotel and then sued its roofing subcontractor.  The Mills court reversed the trial court's ruling that the general contractor was not entitled to indemnification, holding that "the duty of a general contractor to use due care

in repairing the premises of another, insofar as it is applicable to the owner of the premises, is a nondelegable duty which may not be committed to an independent contractor; and the latter will be deemed to be the employee of the general contractor, for whose failure to use due care in repairing said premises the general contractor will be held responsible." Id. at 820.  Continuing, the court explained:  "The general contractor, having undertaken to repair the premises of another, whether by his own employees or through an independent contractor or other agents, is under a duty to the owner of the premises by virtue of a relationship created by the general contract to see to it that due care is used in repairing the premises.  This contractual responsibility of the general contractor to the owner cannot be delegated to a third person in such manner as to relieve the general contractor of liability for violation of his duty in that behalf."  Id.

Hunton Brady argues that it delegated—with Lillibridge's consent and, indeed, at Lillibridge's direction—the responsibility for engineering services under the main contract to Heery.  Hunton Brady contends that the engineering duty was thus delegable rather than nondelegable, rendering Carrasquillo applicable.  However, this case is much more like Mills than Carrasquillo, which involved a tort suit by a third party who suffered personal injury rather than a suit by one contracting party against another for economic damages based on services provided pursuant to the contract.

Clearly, it was understood by the parties that Hunton Brady—which is an architectural firm rather than an engineering firm—would be delegating the engineering work to Heery.  However, this does not mean that such delegation absolved Hunton Brady of legal liability under the contract.  As discussed earlier in this Order, Hunton Brady obligated itself

-36-

contractually to provide architectural and engineering services, and its duties as to engineering arise from the contract.  It was certainly permitted to engage professional engineers for the engineering portion of the project; however, much like a general contractor hired to perform construction services, one contracting party still may look to the other for a remedy if the services are deficient, and the party held liable as a matter of contract may then seek relief from the party at fault via indemnification, as Hunton Brady has done here. The cases cited by Hunton Brady in this second portion of its Rule 52(c) motion do not support its position that it may not be held accountable under the Contract.

### 3.  Breach of Contract

In the third portion of its Rule 52(c) motion, Hunton Brady argues that Lillibridge failed to present evidence that Hunton Brady breached its contract with Lillibridge.  However, as already discussed, the Court rejects this assertion.  Hunton Brady's Rule 52(c) motion is also denied on this point.

### 4.  Reliance on OCBD

Finally, Hunton Brady argues that it was entitled to rely on the approval of the shell and core design documents by OCBD.  As discussed earlier, however, the contract contemplated and called for a specific use for the building—an ASC—and approval by OCBD does not absolve Hunton Brady of liability under the contract.  This last argument of Hunton Brady's Rule 52(c) motion is therefore rejected.

### B.  Heery's Rule 52(c) Motion

Heery also filed a Rule 52(c) motion on the third day of trial.  (Doc. 80).[14]  In the motion, Heery asserts that Lillibridge failed to establish the required elements of each of its causes of action against Heery—breach of contract, negligent design, and negligent misrepresentation.  As discussed earlier, Lillibridge is not being awarded relief directly against Heery on any of these claims.  However, the trial evidence did establish that Heery breached the Subcontract with Hunton Brady by not providing engineering services that resulted in a building suited for its intended purpose.  Heery's contention that Lillibridge failed to establish a breach of contract by Heery because Heery's plans were approved by OCBD is, as discussed earlier, rejected, and Heery's motion is denied.

## V.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.   Defendant Hunton Brady Architects, P.A.'s Motion for Judgment on Partial Findings (Doc. 79) is **DENIED in all respects**.

2.  Defendant Heery Internationals, Inc.'s Motion for Involuntary Dismissal (Doc. 80) is **DENIED in all respects**.

3.  As set forth herein, based on the trial evidence the Court concludes that Plaintiff Lillibridge Healthcare Services, Inc. prevails in part on its breach of contract claim (Count I) against Hunton Brady.  Lillibridge prevails insofar as it seeks to recover for the HVAC error and the GFI error.  Lillibridge does not prevail on its claim with regard to the porte cochére

---

[14]The motion is titled "Motion for Involuntary Dismissal," but Heery's counsel stated in court that the motion is incorrectly labeled and is actually, like Hunton Brady's motion, a motion for judgment on partial findings under Rule 52(c).

lighting error.  Lillibridge established damages in the amount of $245,982.37 on the HVAC system error and in the amount of $41,895 on the GFI error, for total damages of $287,877.37.

4.   The trial evidence establishes that Hunton Brady's crossclaim against Heery for indemnity is well-taken and that Hunton Brady is entitled to be indemnified by Heery for the amount that Hunton Brady is obligated to pay to Lillibridge as a result of Heery's errors.

5.   **On or before Friday, October 1, 2010**, Lillibridge shall, after conferring with Defendants, submit a proposed judgment to the Court, noting the disagreements, if any, of Defendants with regard to the terms thereof.

**DONE** and **ORDERED** in Orlando, Florida this 24th day of September, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record